UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| B., *et al.*,<br><br>    *Plaintiffs,*<br><br>v.<br><br>Board of Education Hinsdale Township,<br>Hinsdale High School District 86, *et al.*,<br><br>    *Defendants.* | No. 24 CV 12218<br><br>Judge Lindsay C. Jenkins |

MEMORANDUM OPINION AND ORDER

Plaintiff T.B., by and through her parents and next friends P.B. and R.B., brings this suit against the Hinsdale Township High School District 86 Board of Education and Hinsdale Township High School District 86 for discrimination in violation of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq.*, Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and the Civil Rights Remedies Restoration Act, 775 ILCS 60 *et seq.* [Dkt. 1.][1] Before the Court is Defendants' motion to dismiss [Dkt. 9]. Fed. R. Civ. P. 12(b)(6). For the reasons below, the motion is granted in part.

## I.     Background

The Court takes T.B.'s well-pleaded factual allegations as true for purposes of ruling on the motion to dismiss. *See Smith v. First Hosp. Lab'ys, Inc.*, 77 F.4th 603, 607 (7th Cir. 2023).

---

[1]     Citations to docket filings generally refer to the electronic pagination provided by CM/ECF, which may not be consistent with page numbers in the underlying documents.

T.B. is a 17-year-old student enrolled at Hinsdale Central High School, which lies within Hinsdale High School District 86 and is overseen by the district's Board of Education. [Dkt 1, ¶¶ 6, 14–15.] T.B. is deaf and has cochlear implants that allow her to hear some speech and sound, but do not fully augment her hearing and auditory processing, especially in a loud classroom environment. Consequently, T.B. relies on her cochlear implants, lipreading, and computer assisted real-time transcription ("CART") to understand auditory speech around her. She also requires support from classroom notes, preferential seating, and a teacher of the deaf/hard of hearing (a hearing itinerant). [*Id.*, ¶¶ 16–18.] T.B.'s educational accommodations, modifications, goals, and services are documented in an individualized education program ("IEP"), which sets out the services and support that her school district has agreed to provide pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.* [*Id.*, ¶ 23.]

T.B. first received her cochlear implants in 2018 and 2019. When she started sixth grade in August 2019, T.B.'s accommodations included an FM system (a microphone clipped to her teacher with auditory output going to T.B.'s cochlear implants) and a hearing itinerant. [*Id.*, ¶¶ 20–22.] In March 2020, her school began providing services remotely through Google Meets due to the Covid-19 pandemic. The platform included real-time automated captions through the Live Transcribe program. This was the first time T.B. had received auditory captioning services and realized that she'd been missing significant instruction without captioning. [*Id.*, ¶ 25.] When the 2021-2022 school year began, T.B. was required to resume in-person

attendance. The district gave T.B. a computer so she could open Google Meets and have Live Transcribe generate captioning while she was in class. However, her experience was diminished because when students attended remotely, visual cues indicated who was talking at any one time and each student had their own microphone. But in person, Live Transcribe was less accurate because there was only a microphone on her computer and it did not distinguish speakers. [*Id.*, ¶¶ 28–30.]

In 2022, T.B. started attending school in District 86 when she began 9th grade at Hinsdale Central High School. T.B. still had a hearing itinerant, as provided in her IEP, and continued using Live Transcribe. However, T.B found the automated captioning less helpful at a high school level because there were more student discussions, and the classes moved faster. The captioning also contained many errors. [*Id.*, ¶¶ 31–32.] Teachers also failed to consistently repeat student comments, as required by T.B.'s IEP. Consequently, T.B. spent many extra hours during the week and on the weekend completing homework. [*Id.*, ¶ 33.]

T.B. requested CART services as early as September 2022 after relaying the difficulties she was experiencing to her hearing itinerant and District 86 staff. The District tried different microphone setups in the classroom, but Live Transcribe still failed to accurately caption classroom instruction and discussion. [*Id.*] The District convened an IEP meeting on November 28, 2022 and documented her parents' concerns as discussed above, including that it was difficult for T.B. to hear student responses during class. T.B.'s hearing itinerant suggested multiple times during the school year that the District provide CART word-for-word or meaning-for-meaning

transcription. Her parents also continued to request CART from the District, which was slow to consider it. [*Id.*, ¶¶ 34–35.]

CART was added to T.B.'s IEP on November 23, 2023. The District agreed to provide "[r]eal-time accurate captioning in academic settings," to include (among other things) "real-time captioning without significant delays," at a "high rate of accuracy and clarity," that would "differentiate between speakers." [*Id.*, ¶ 36.] The District began providing CART services through Intellitext in January 2024. Intellitext's program provides CART remotely through a live transcriber using a program that provides meaning-for-meaning transcription using audio feed from a microphone in the classroom. T.B. found Intellitext more helpful than Live Transcribe and asked the District to notify her if it was considering changing vendors. [*Id.*, ¶¶ 40–41.]

In spring of 2024, the District trialed another CART provider, Karasch, in one class period for the semester. Karasch provides word-for-word rather than meaning-for-meaning transcription. The District then switched from Intellitext to Karasch at the beginning of the 2024-2025 school year without consulting T.B. or her parents. [*Id.*, ¶¶ 42–43.] T.B. had immediate concerns with Karasch because the transcripts were more difficult to follow and missed parts of the conversation numerous times per class, marking the dialogue "inaudible" about every 1–2 minutes. Many of T.B.'s classes incorporated small group work during class, for which transcriptions were unavailable due to background noise. Karasch also had transcriptionists of varying quality and who couldn't understand her more technical classes [*Id.*, ¶¶ 44–48.]

On September 4, 2024, T.B.'s parents emailed District staff pointing out these accuracy issues and asking the District to resume CART services through Intellitext. The District indicated that it was unaware of these issues previously. After a series of emails, the District indicated that it needed to consider the wishes of the District and IEP team. It did not mention T.B.'s preferences. On September 16, 2024, T.B.'s parents sent a demand letter to the District requesting effective communication through Intellitext but the District continued with Karasch. [*Id.*, ¶¶ 48–52.]

On October 17, 2024, the District convened two meetings to discuss accommodations under the ADA and T.B.'s services through her IEP. During the ADA meeting, T.B. requested in-person CART services due to transcription issues when the transcriber was remote. The District agree to provide in-person CART services and to resume services through Intellitext until then, which it did on October 21, 2024. As of the filing of T.B.'s complaint (November 26, 2024), the District has not provided in-person CART services. [*Id.*, ¶¶ 53–55.] The District noted in November 2024 that it was unable to find in-person CART providers who provide meaning-for-meaning rather than word-for-word transcription but that it could provide the latter. T.B. indicated that she preferred to try an in-person word-for-word transcriber but reserved the opportunity to return to Intellitext if in-person services didn't provide more accurate or readable transcripts. [*Id.*, ¶ 78.]

During the District meeting on October 17, T.B. also requested completed notes in her classes. The District documented this need in her IEP, but did not guarantee them. Instead, it specified that "[i]n classes with frequent class/student discussions,

5

teachers will inquire about peers to be a peer note-taker." As of the filing of T.B.'s complaint (November 26, 2024), T.B. has received completed notes in two of five classes for which she needs them. [*Id.*, ¶¶ 56–59.]

Finally, T.B. noted in the same meeting that she was missing access to parts of class because her teachers would start class without her CART services set up. Instead, T.B. had to sign into the computer at the beginning of each class and consequently missed the beginning of class. The District initially had an individual computer for CART in each classroom but then gave T.B. a second computer in addition to her own to carry from class to class. However, she had the same login issue. T.B. requested a tablet instead and that teachers ensure CART is set up before they start class. [*Id.*, ¶¶ 60–61.] The District indicated that it would look into a tablet and noted that an in-person CART transcriber would have their own computer but, to date, T.B. has not received either a tablet or in-person transcriber. [*Id.*, ¶¶ 62.]

T.B., through her parents, sued Hinsdale High School District 86 and its Board of Education, alleging that they have intentionally discriminated against T.B. by failing to provide effective communication in violation of Title II of the ADA and Section 504 of the Rehabilitation Act (Counts I–II). She also alleges that these violations of the ADA and Rehabilitation Act constitute a violation of the CRRRA (Count III). T.B. seeks compensatory damages and injunctive relief, including in-person CART services; completed notes for each class; training to all educators and staff in District 86 and the Board regarding Title II and Section 504 requirements for effective communication and equal educational opportunity; and policies and

6

procedures within District 86 and the Board to ensure deaf and hard of hearing individuals receive their preferred mode of communication in a timely manner. [Dkt. 1 at 22.]

## II. Legal Standard

At the motion to dismiss stage, the Court takes well-pleaded factual allegations as true and draws reasonable inferences in favor of the plaintiff. *Reardon v. Danley*, 74 F.4th 825, 826–27 (7th Cir. 2023). "To survive a motion to dismiss under Rule 12(b)(6), plaintiff's complaint must allege facts which, when taken as true, plausibly suggest that the plaintiff has a right to relief, raising that possibility above a speculative level." *Cochran v. Ill. State Toll Highway Auth.*, 828 F.3d 597, 599 (7th Cir. 2016) (cleaned up). This occurs when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Garrard v. Rust-Oleum Corp.*, 575 F. Supp. 3d 995, 999 (N.D. Ill. 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations omitted)).

## III. Analysis

### A. *Fry* Test

Defendants argue that T.B.'s claims brought under Title II of the ADA and Section 504 of the Rehabilitation Act (Counts I–II) must be dismissed for failure to exhaust the administrative process provided under a related statute, the IDEA.[2] All

---

[2]    Failure to exhaust under the IDEA is an affirmative defense that a plaintiff need not anticipate in their complaint. *Mosely v. Bd. of Educ. of City of Chicago*, 434 F.3d 527, 533 (7th Cir. 2006). It's clear from the face of the complaint that T.B. did not exhaust her remedies

three statutes protect individuals with disabilities but differ in scope. The IDEA offers federal funds to States in exchange for recipients' commitment to provide a "free and appropriate public education" ("FAPE") to all children with certain physical or intellectual disabilities. 20 U.S.C. § 1412(a)(1)(A). As such, it only covers children in school or of school age. A qualifying child primarily receives a FAPE, which consists of "special education and related services," through an "individualized education program" ("IEP"), which outlines a personalized plan to meet that child's educational needs, as defined by school officials, teachers, and the child's parents (the "IEP Team"). *Id.* at §§ 1401(9), 1414(d). Among other things, an IEP lists the "special education and related services" to be provided. The IDEA also establishes a formal process for resolving disputes related to the provision of a FAPE. *Id.* at § 1415.

By contrast, Title II forbids any "public entity" from discriminating based on a disability. 42 U.S.C. §§ 12131–32. Section 504 similarly prohibits disability discrimination in any federally funded "program or activity." 29 U.S.C. § 794(a). Title II and Section 504 cover both adults and children with disabilities, whether in school or another public setting, and authorize individuals to sue for injunctive or compensatory relief. 42 U.S.C. § 12133; 29 U.S.C. § 794a(a)(2). The elements of a discrimination claim under Title II and Section 504 are nearly identical. *A.H. by Holzmueller v. Ill. High Sch. Assoc.*, 881 F.3d 587, 592 (7th Cir. 2018). "In short, the

---

under the IDEA and, in anticipation of this defense, the complaint argues that IDEA exhaustion is not required. [Dkt. 1, ¶¶ 100–05.] Given that the complaint includes all of the information necessary to resolve this question, the Court may decide it at the motion to dismiss stage. *See Hyson USA, Inc. v. Hyson 2U, Ltd.*, 821 F.3d 935, 939 (7th Cir. 2016) (holding that dismissal on affirmative defense is appropriate when the complaint contains factual allegations that establish all elements of the defense).

IDEA guarantees individually tailored educational services, while Title II and § 504 promise non-discriminatory access to public institutions." *Fry v. Napoleon Cmty. Sch.*, 580 U.S. 154, 170–71 (2017).

The IDEA, Title II, and Section 504 differ in their scope and implementation. Relevant here, Title II includes an "effective communication" regulation, which sets out requirements for public entities to "ensure that communications" with persons with disabilities are "as effective as communications with others." 28 C.F.R. § 35.160(a)(1). Public entities must provide "auxiliary aids and services" to achieve effective communication, including but not limited to "real-time computer-aided transcription services," "notetakers," "written materials," and "exchange of written notes." *Id.* at § 35.104. Auxiliary aids and services "must be provided in accessible formats, in a timely manner." § 35.160(b)(2). Although a disabled individual may be entitled to similar services under the IDEA and Title II, the IDEA sets educational requirements appropriate for a child depending on their specific circumstances while the ADA requires services to be "not just accessible, but *equally* accessible to people with communication disabilities." *K.M. ex rel. Bright v. Tustin Unified Sch. Dist.*, 725 F.3d 1088, 1097 (9th Cir. 2013) (emphasis in original). The ADA also requires public entities to give "primary consideration" to the disabled individual's preference in determining what auxiliary aids and services are needed, while the IDEA does not. *Id.* at 1100–01 (citing § 35.160(b)(2)); *see also Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 401 (2017) (under the IDEA, an IEP must be "reasonably calculated to enable a child to make progress appropriate in light of the

child's circumstances" as determined by the child's IEP team). Section 504 has an analogous effective communication regulation. *See* 28 C.F.R. § 39.160; 42 U.S.C. § 12134(b) (requiring Title II "communications" regulations be consistent with 28 C.F.R. § 39).

The overlap between the IDEA, ADA, and Rehabilitation Act would threaten to allow litigants seeking a FAPE to circumvent the IDEA's administrative scheme by suing instead under the ADA or Rehabilitation Act. *Fry*, 580 U.S. at 171 (noting that the "same conduct might violate all three statutes"). Consequently, the IDEA requires a plaintiff to first exhaust the IDEA's administrative process when they seek "relief that is available" under the IDEA. The relevant IDEA provision reads:

> Nothing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the [ADA], [the Rehabilitation Act], or other Federal laws protecting the rights of children with disabilities, except that before the filing of a civil action under such laws seeking relief that is also available under this subchapter, the procedures under subsections (f) and (g) shall be exhausted to the same extent as would be required had the action been brought under this subchapter.

20 U.S.C. § 1415(l). *Fry* held that the only relief available under the IDEA is for a FAPE, so a plaintiff is only compelled to exhaust under the IDEA when the gravamen of their complaint seeks relief for the denial of a FAPE. 580 U.S. at 165–69. Exhaustion is also unnecessary if a plaintiff seeks relief the IDEA cannot provide, such as compensatory damages. *Luna Perez v. Sturgis Pub. Schs.*, 598 U.S. 142, 147–50 (2023). It may also be excused "if administrative review would be futile or inadequate." *Jamie S. v. Milwaukee Pub. Schs.*, 668 F.3d 481, 494 (7th Cir. 2012) (citing *Honig v. Doe*, 484 U.S. 305, 326–27 (1988)).

10

Under the current state of the law then, courts employ a multi-stage analysis to determine whether a party must exhaust their remedies under the IDEA. First, a court must assess whether the gravamen of the complaint concerns denial of a FAPE. If it doesn't, exhaustion is unnecessary. But if it does, the court must then ask whether the relief sought is also available under the IDEA. If the relief is not available, the plaintiff may seek relief under another statute. But if it is, the final step is to ask whether any exclusion to IDEA exhaustion nevertheless applies.

T.B. argues that exhaustion is not required under any line of inquiry: first, she is not seeking relief for denial of a FAPE, but rather for Defendants' failure to provide "effective communication" as required by the ADA and Section 504, and the emotional toll of striving to succeed in school without equal access to instruction. [Dkt. 13 at 5.] Alternatively, T.B. argues that the IDEA doesn't provide the relief she seeks, and that exhaustion would be futile and cause severe or irreparable harm. [Dkt. 1, ¶¶ 100–05.] Defendants argue the opposite on each point. The Court begins with the first question: whether T.B. is seeking relief for denial of a FAPE.

*Fry* sets out the principal test for determining whether a plaintiff is seeking relief for denial of a FAPE. This complaint-focused inquiry hinges upon the substance of the complaint, ignoring labels such as the inclusion (or omission) of references to an IEP or a FAPE. "What matters is the crux—or, in legal-speak, the gravamen—of the plaintiff's complaint, setting aside any attempts at artful pleading." *Fry*, 580 U.S. at 169. The Supreme Court identified two hypothetical questions that provide "clues" as to the gravamen of a complaint: (1) "could the plaintiff have brought essentially

11

the same claim if the alleged conduct had occurred at a public facility that was *not* a school?" and (2) "could an *adult* at the school . . . have pressed essentially the same grievance?" *Id.* at 171 (emphasis in original). If the answer to both questions is no, the complaint "probably does concern a FAPE." *Id.*

*Fry* illustrated this inquiry in contrasting scenarios. "Suppose first that a wheelchair-bound child sues his school for discrimination under Title II . . . because the building lacks access ramps." *Id.* The Court observed that although the lack of ramps would impact the child's ability to receive academic instruction, such a plaintiff could file "the same basic complaint" if a public library had no ramps. *Id.* at 171–72. As to the second question, a school employee or visitor could also "bring a mostly identical complaint" against the school. This suggests that the "essence" of the complaint is "equality of access to public facilities, not adequacy of special education." *Id.* at 172.

Conversely, the Court also considered a student with a learning disability who sues his school under Title II for failure to provide remedial tutoring. In this situation, the answer to the Court's hypothetical questions was "no": a student could not demand remedial tutoring from a public library or theater, and an adult school employee or visitor could not sue "to obtain a math tutorial." *Id.* at 172–73. This suggests that what the complaint really concerns is a denial of a FAPE and therefore requires exhaustion under the IDEA. *Id. Fry* itself considered a disabled student's request to permit her service dog to attend her at school, finding the answer to both questions in that scenario to be "yes." *Id.* at 174–75.

12

*Fry* also observed a "further sign" as to the gravamen of a complaint: whether the plaintiff had previously invoked the IDEA's formal procedure to resolve the dispute before turning to the courts. *Id.* at 173 ("A plaintiff's initial choice to pursue that process may suggest that she is indeed seeking relief for the denial of a FAPE . . . .").

The line between FAPE and non-FAPE based complaints isn't always apparent. As one circuit explained, some "parents may seek an IEP amendment" for a child that has limitations requiring Section 504 accommodations as well as a learning disability that qualifies them for an IEP because an IEP is the "most effective and direct way to get the child [safe access to school]," but later issues may nevertheless have "nothing to do with the delivery of a FAPE." *Doucette v. Georgetown Pub. Schs.*, 936 F.3d 16, 28 (1st Cir. 2019). *Fry's* hypothetical questions aim to determine whether a plaintiff in this situation—one who could have proceeded under either statute—"nevertheless raises a claim whose *substance* is the denial of an appropriate education." *Fry*, 580 U.S. at 173 n.10 (emphasis in original).

*Fry* inevitably left open questions about its application and the Seventh Circuit has yet to weigh in, *see Pierce as Next Friend of B.P. v. Whiteside Sch. Dist. No. 115 Bd. of Educ.*, 2022 WL 14813416 (S.D. Ill. Oct. 26, 2022), *appeal docketed*, No. 22-3106 (7th Cir. argued Sep. 21, 2023), but district courts and several other circuits aid the Court's analysis.

## B.    Gravamen of the Complaint

T.B. alleges that Defendants' continuing failure to provide accurate, in-person CART services and class notes effectively excludes her from class participation,

deprives her of equal access to instruction and class discussion, and causes emotional distress, physical and mental exhaustion, humiliation, and stigma. [Dkt. 1, ¶¶ 78–81, 88–89] The parties dispute whether these allegations seek relief for denial of a FAPE. T.B. describes the core of her complaint as *unequal access* to school and accompanying feelings of isolation and distress, as well as academic struggle. She likens her situation to the *Fry* plaintiff's need of a service dog in school: "In both cases, the accommodations at issue allow the student an equal opportunity to participate in and enjoy the benefits of the school district's programs as required by [Title II and Section 504.]" [Dkt. 13 at 5.] T.B. also argues that *Fry's* hypothetical questions support this conclusion: because a disabled individual could request the same services (CART services and written notes) to access content in a school or other public institution under the ADA and Rehabilitation Act's effective communication regulations, *Fry's* questions must be answered affirmatively. *See* 28 C.F.R. § 35.104 (listing as auxiliary aids and services "real-time computer-aided transcription services," "notetakers," "written materials," and "exchange of written notes"). A student could thus request CART and notes to access content provided in a theater or library, while an adult could request the same for a parent-teacher conference in a school.

Defendants apply *Fry* differently. They argue that T.B.'s claims "boil down to" denial of two IEP provisions—in-person CART services and peer notes. [Dkt. 9 at 9.] The "same basic suit," *Fry*, 580 U.S. at 171, could not be brought against a non-school public entity because "IEPs are only enforceable within a school/school-related

14

context." [Dkt. 9 at 9.] Although another public facility would have to provide T.B. access, it would be "unrelated to T.B.'s IEP or FAPE," [*id*.], and consequently, not "essentially the same claim." *Fry*, 580 U.S. at 171. Argued a different way, Defendants maintain that because T.B. alleges she suffered a loss of educational instruction, her underlying claim concerns "participation in the academic instruction unique to the District." [Dkt. 14 at 3; *see* Dkt. 1, ¶¶ 81, 89 (alleging that, due to Defendants' ADA and Rehabilitation Act violations, T.B. "suffered loss of access to instruction" and "loss of access to class discussions").] Since T.B couldn't bring a claim for educational instruction in a non-school public facility that doesn't provide such instruction, her complaint must be FAPE-based and require IDEA exhaustion. [Dkt. 14 at 3–4.] Similarly, since an adult requesting CART services or written notes would be requesting accommodation for a non-instructional purpose, their claim wouldn't be the same as T.B.'s within *Fry's* meaning. [Dkt. 9 at 9–10; Dkt. 14 at 4–6 (citing *Pierce*, 2022 WL 14813416).] Consequently, the gravamen of T.B.'s complaint is for denial of a FAPE.

Defendants rely on *Pierce*, which is perhaps the most factually similar IDEA exhaustion case. 2022 WL 14813416. In *Pierce*, a hearing-impaired student brought discrimination claims under the ADA and Rehabilitation Act against his school district for failure to properly instruct teachers on use of a Digital Modulation ("DM") system, which transmitted the teacher's voice to the plaintiff's cochlear implants, and failure to provide written notes ahead of class. Both accommodations were also required by the plaintiff's IEP. *Id.* at *1. The court considered whether exhaustion

was required under the IDEA, ultimately concluding that it was. In answering the first question, *Pierce* held that a student could not bring the same claims outside a school because the allegations "would only be actionable conduct in a school setting where the public school is obligated for FAPE." *Id.* at *4. It didn't offer further analysis on this question, but broadly concluded that the substance of the complaint concerned the adequacy of special education rather than equal access because the plaintiff's IEP "provide[d] a basis for the complaint." *Id.* at *6. *Pierce* also answered "no" to *Fry's* second question, reasoning that because the plaintiff's claims dealt with required IEP accommodations, they concerned the adequacy of special education, which an adult could not pursue in a school. *Id.* at *4.

T.B.'s circumstance doesn't fit neatly into *Fry's* test. On one hand, the relief she seeks is expressly contemplated in the ADA and Rehabilitation Act's effective communication regulations, and she could technically seek the same services outside a school. On the other hand, T.B.'s grievances and relief sought almost entirely overlap and are tightly bound up with her educational experience. The bulk of injuries alleged concern lost access to classroom instruction, extra time spent completing schoolwork, and a struggle to keep up academically. [Dkt. 1, ¶¶ 33, 81, 88–89.] Similarly, the relief T.B. seeks largely relates to services in her IEP. For example, her IEP requires CART services that meet certain requirements including a "real-time captioning without significant delays" and a "high rate of accuracy and clarity," features that T.B. contends the CART services provided to date lack. [*Id.* at ¶¶ 36, 44, 52, 54; *see also id.* at ¶ 78 (alleging T.B. would like to retain the opportunity to

return to Intellitext if in-person CART doesn't provide "a higher level of accuracy or readability in the transcripts.")] Whether the CART services T.B. currently has or those she seeks meet her IEP's requirements would normally be determined through the IDEA's administrative process. T.B.'s IEP also requires teachers to request peer notes but doesn't guarantee them. By requesting completed notes, T.B. essentially seeks a modification to her IEP. [Dkt. 1 at 22 (requesting completed notes for each class period).] The strong educational valence of the complaint could indicate that T.B. couldn't bring the same claim in a non-academic setting, nor could an adult do so in a school where they're not entitled to education. Much depends on the level of generality used in employing *Fry's* test.

The Court ultimately agrees with Defendants and *Pierce's* outcomes, although they contain some analytical gaps and inaccuracies that warrant explanation. First, neither the invocation nor content of an IEP is dispositive for IDEA exhaustion analysis. *Fry* rejected such a simplistic approach, mandating that courts consider the substance of a complaint rather than its inclusion or exclusion of the words "FAPE" or "IEP." 580 U.S. at 169–70. The omission of certain words, if relied upon, would allow plaintiffs to avoid IDEA exhaustion through "artful pleading." *Id.* at 170. Conversely, merely "[i]nvoking the existence and content of an IEP" to provide context for a claim doesn't "convert a discrimination lawsuit into an IDEA action requiring exhaustion." *Doe v. Twp. High Sch. Dist. 214*, 2020 WL 1081726, at *4 (N.D. Ill. Mar. 6, 2020); *see also Doe v. Dallas Indep. Sch. Dist.*, 941 F.3d 224, 227 (5th Cir. 2019)

(invocation of IEP to show school had notice regarding plaintiff's inability to protect herself in Title IX case did not imply IDEA exhaustion was required).

More critically here, the fact that relief sought appears in an IEP is relevant but doesn't mean a FAPE is necessarily at issue. An IEP is the IDEA's "primary vehicle" for providing a child a FAPE, *Fry*, 580 U.S. at 158, and a plaintiff denied services required by their IEP can pursue the IDEA's administrative remedies. But *Fry* also recognized that the same conduct may violate and be cognizable under multiple statutes, including the IDEA, Title II, and Section 504. *Id.* at 171, 173 n.10. For example, the Court noted that a wheelchair-bound student bringing a discrimination claim under Title II might also have brought an IDEA claim because access to school impacts access to education. But the claim may nevertheless be unrelated to a FAPE. *Id.* at 171–72. *Fry's* hypothetical test was crafted precisely for these situations in which a plaintiff can proceed under multiple statutes and aims to identify whether they seek relief for denial of FAPE or something else, like discrimination. *Id.* at 173, n.10. Consequently, *Fry* contemplated the possibility that the content of an IEP, although relevant, does not invariably control the question of exhaustion. If it did, courts could jettison *Fry's* hypothetical test and simply ask whether the relief sought appears or could appear in the plaintiff's IEP.

Decisions from other circuits applying *Fry* similarly recognize that the content of an IEP is not dispositive. *See, e.g.*, *Doucette*, 936 F.3d at 27–28; *J.S., III by and through J.S. Jr. v. Houston Cnty. Bd. of Edu.*, 877 F.3d 979, 986 (11th Cir. 2017) (per curium) (explaining that plaintiff's removal from his regular classroom "could be

18

brought as a FAPE violation for failure to follow [his] IEP," but was also cognizable under the ADA and Section 504); *Pierce*, 2022 WL 14813416, at *4 (noting that a wheelchair-bound child's entitlement to an IEP doesn't imply that an ADA claim premised on required ramp access is subject to exhaustion). As the Sixth Circuit explained in *Knox*, a wheelchair ramp accommodation may or may not appear in an IEP depending on whether a child otherwise qualifies for an IEP, *Doe by K.M. v. Knox Cnty. Bd. of Educ.*, 56 F.4th 1076, 1083 (6th Cir. 2023), yet *Fry* shows that a claim based on lack of wheelchair access can have a non-FAPE basis. Consequently, an IEP is not a perfect proxy for determining whether exhaustion is needed.

However, Defendants are correct that the content of an IEP may still be informative. In *Fry's* own analysis, the Court found it relevant that "[t]he complaint contains no allegation about . . . any deficiency in [plaintiff's] IEP" and did not "accuse the school even in general terms of refusing to provide the educational instruction and services" needed. 580 U.S. at 174. Instead, the plaintiff alleged that the school district infringed his right of equal access even if its actions fully complied with the IDEA. *Id.* at 175; *see also Arc of Iowa v. Reynolds*, 24 F.4th 1162, 1175–76 (8th Cir. 2022) (noting that plaintiffs did not challenge the adequacy of their special education services or IEP, or otherwise make IEP compliance a "central dispute" of the litigation), *vacated as moot*, 33 F.4th 1042 (8th Cir. 2022); *Wellman v. Butler Area Sch. Dist.*, 877 F.3d 125, 133 (3d Cir. 2017) ("[C]laims related to the implementation of an IEP involve the provision of a FAPE and are subject to exhaustion."); *T.Z. by &*

19

*through P.Z. v. Tippecanoe Sch. Corp.*, 2023 WL 403773, at *7 (N.D. Ind. Jan. 25, 2023) (noting that plaintiff did not seek to enforce or modify the terms of his IEP).

Unlike *Fry*, T.B. alleges that Defendants have not complied with her IEP by failing to provide in-person and highly accurate CART services. [Dkt. 1, ¶¶ 78, 104.] She also contests the content of her IEP by alleging that it should guarantee class notes. [*Id.* at ¶¶ 56–58.] T.B. links these discrepancies to a lack of access to educational instruction. Although the parties agree T.B. has good grades, she alleges that she struggles to keep up academically because the lack of appropriate services makes the learning process longer and harder. These allegations are fundamentally based on access to the special education and related services as described in T.B.'s IEP and therefore invoke denial of a FAPE.

*Knox* also provides an insightful analysis of the text of the IDEA and circuit precedent to flesh out what constitutes a FAPE. The IDEA defines a FAPE as "special education and related services." 20 U.S.C. § 1401(9)(D). Drilling down into these terms of art as defined in the statute and regulations, *Knox* concluded that a plaintiff seeks relief for denial of a FAPE "if a child needs an *instructional change*, not just a *non-instructional accommodation* to some school rule or policy." 56 F.4th at 1082 (emphasis in original). It noted that "special education," means "specially designed instruction" developed to "meet the unique needs of a child with a disability," *id.* at § 1401(29)(A)–(B), which may include instruction that has been adapted in its "content, methodology, or delivery." 34 C.F.R. § 300.39(b)(3). "Related services" reinforce the conclusion that FAPE is concerned with instructional change, as it is

defined as "transportation and such developmental, corrective, and other supportive services as are required to assist a child with a disability *to benefit from special education.*" *Id.* at § 300.34(a) (emphasis added). *Knox* also noted that the need for a related service alone doesn't entitle a child to an IEP—they must also require special education. 56 F.4th at 1083.

Multiple circuits have applied *Fry* consistently with *Knox's* delineation between instructional and non-instructional relief. Courts routinely require exhaustion where a plaintiff seeks clearly instructional relief, such as a tutor, a one-on-one aide, extra study halls or time to complete classes, home or online schooling, or excusal from participation in certain academic activities. *See, e.g.*, *id.* (collecting cases); *Wellman*, 877 F.3d at 133. Indeed, these services are so integral to academic instruction that it would be nonsensical for a student to seek them outside of a school, or for an adult to seek them in one because they're simply not available. By contrast, relief related to non-instructional services or policies generally doesn't require exhaustion. Such relief has commonly included the need for wheelchair ramps or a service dog in a school, relief from physical abuse in a classroom, and from school policies that cause isolation, physical restraint, discomfort, or inability to focus. *See, e.g.*, *Fry*, 580 U.S.; *Knox Cnty.*, 56 F.4th at 1084–87 (seeking ban on gum in classroom due to hypersensitivity to the sound of chewing); *Dallas Indep. Sch. Dist.*, 941 F.3d, 227–29 (seeking relief related to sexual harassment at school); *Twp. High Sch. Dist. 214*, 2020 WL 1081726, at *5 (seeking relief for harassment, isolation, investigation,

21

and punishment by school administrators due to disability); *Tippecanoe Sch. Corp.*, 2023 WL 403773, at *8 (collecting cases).

The relief T.B. seeks—in-person CART services and written class notes— doesn't fall neatly into either category: both give T.B. better perceptive access to information the way wheelchair ramps help a wheelchair-bound student reach a classroom. On the other hand, both are far more intertwined with the delivery of educational instruction than wheelchair ramps. The latter requires an architectural change to the school completely independent of instruction while class notes require a method of delivering instruction (written form) that a teacher would not normally provide. [Dkt 1, ¶¶ 57–58 (alleging that T.B. has difficulty taking notes, reading captions, and lipreading at the same time due to her disability).] CART services are less obviously instructional but are considered a "related service" in the IDEA, and thus might be considered part of a FAPE. *See* 34 C.F.R. § 300.34(a) (defining "related services" to include "interpreting services"; *id.* at § 300.34(c)(4) (defining "interpreting services" to include "transcription services, such as [CART]").

Second, T.B.'s allegations about education-related harms aren't dispositive for exhaustion. Defendants contend, for example, that because T.B. alleges that their conduct caused a loss of access to education, her claim necessarily concerns a FAPE. [Dkt. 14 at 3.] *Fry* rejected this logic, noting that asking whether injuries are "educational in nature" is not the same as asking whether the gravamen of a complaint seeks relief for denial of a FAPE. 580 U.S. at 174 (internal quotation marks omitted). As *Fry* and other courts have explained, many discriminatory injuries that

22

students sustain in school affect their access to education by virtue of occurring in an academic setting, but that broader harms implicating "intangible consequences of discrimination . . . such as stigmatization" may demonstrate that the crux of the complaint is not about a FAPE. *J.S.*, 877 F.3d at 986–87; *see also Knox Cnty.*, 56 F.4th at 1086; *Twp. High Sch. Dist. 214*, 2020 WL 1081726, at *5 ("Notwithstanding the complaint's language regarding the educational limits Plaintiff ran up against, the crux of the complaint is directed toward discrimination that had nothing to do with a FAPE . . . .").

But neither are educational harms irrelevant. Instead, some cases demonstrate that the correct inquiry is whether the educational harm is the primary harm alleged or simply a secondary consequence of a more prominent discriminatory harm. For example, *Twp. High Sch. Dist. 214* considered a student who alleged discrimination because he was repeatedly targeted by school administrators, pulled out of class, investigated, and punished. Although these actions may have violated the student's IEP and the complaint referenced educational harm (falling behind in class), the court found that exhaustion under the IDEA was unnecessary because the "underlying problem was discrimination, which caused further deterioration of [plaintiff's] educational opportunities." 2020 WL 1081726, at *4–5. The court contrasted the student's situation with *Wellman*, where the "causal chain [went] in the opposite direction." *Id.* at *5. There, a student alleged discrimination based on the school district's failure to provide various accommodations for his concussion, such as tutors, study halls, extra time to complete work, and excusal from certain

classes. The complaint alleged that these failures prevented him from achieving the level of learning expected and effectively excluded him from school. 877 F.3d at 127, 133. The court acknowledged that some allegations, such as the failure to exclude the student from physical education, could relate to safety rather than a FAPE, but concluded that the complaint as pled alleged denial of a FAPE because it was primarily concerned with the school's failure to accommodate educational needs so that the student could benefit from an educational experience. *Id.* at 134.

Here, T.B. alleges significant educational harm in the form of lost access to class content and academic struggle due to the lack of more accurate CART services and written notes. [Dkt. 1, ¶¶ 81, 89.] As in *Wellman*, she alleges that Defendants' failure to provide these accommodations effectively excludes her from class and denies her educational benefits. [Dkt. 1, ¶ 81.] T.B. also alleges mental and emotional distress, humiliation, and stigma. [*Id.* at ¶ 89; Dkt. 13 at 5.] But these harms appear to be caused first and foremost by her lack of access to education, not the other way around. They are not the crux of her complaint, which focuses almost entirely on her educational experience. The gravamen of the complaint, then, is the adequacy of the special education and related services T.B. is receiving, *i.e.*, a FAPE.

Finally, the "history of proceedings" doesn't indicate that the gravamen of the complaint is about denial of a FAPE because T.B didn't pursue IDEA administrative remedies and then pivot to federal court. [Dkt. 13 at 9–10]; *see Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012) (noting that a plaintiff may assert new facts in brief opposing motion to dismiss if consistent with the pleadings). However,

declining to pursue the IDEA's administrative process doesn't necessarily mean a FAPE is *not* at issue.

In sum, the gravamen of T.B.'s complaint is about denial of a FAPE. The Court recognizes that this case is not the comfiest fit for *Fry's* test and, in similar contexts, a plaintiff may not be seeking a FAPE. But *Fry* instructed courts to attend to the diverse means and ends of the IDEA, Title II, and Section 504 in identifying the gravamen of a complaint. 580 U.S. at 170. The IDEA aims to provide meaningful access to individualized instruction unique to a student's needs. Its administrative process allows parents and school educators—those closest to the student's educational experience—to "fully air their respective opinions on the degree of progress a child's IEP should pursue" and how to pursue it. *Endrew*, 580 U.S. at 404. The ADA and Rehabilitation Act, by contrast, aim to uproot discrimination through equal access to public facilities and federally funded programs. *Fry*, 580 U.S. at 170. Here, T.B.'s grievances are primarily based on a lack of access to educational instruction and only secondarily allege the emotional harm and isolation traditionally associated with a discrimination claim. She also almost exclusively seeks services or modifications to services required by her IEP. In this case, the IDEA's administrative process is the appropriate forum to initially air and attempt to resolve T.B.'s grievances. Should that process not result in the relief T.B. seeks, she may pursue judicial action.

## C.    Remedies

Having concluded that T.B.'s complaint alleges denial of a FAPE, the next question is whether she seeks relief that the IDEA can provide. *Luna Perez*, 598 U.S.

T.B. seeks both compensatory and equitable relief. [Dkt. 1 at 22.] Although *Luna Perez* involved a plaintiff seeking only compensatory relief, the Court commented on mixed relief as well, stating that "a plaintiff who files an ADA action seeking both damages and the sort of equitable relief IDEA provides may find his request for equitable relief barred or deferred if he has yet to exhaust § 1415(f) and (g)." *Id.* at 150. By its plain terms, *Luna Perez* doesn't prevent ADA or Rehabilitation Act claims from proceeding where a plaintiff seeks mixed relief, it just prevents the plaintiff from pursuing equitable relief available under the IDEA until they have exhausted its administrative process. *See also Doe v. Franklin Square Union Free Sch. Dist.*, 100 F.4th 86, 102 n.9 (2d Cir. 2024), *cert. denied*, 145 S. Ct. 570 (2024); *Chavez as next friend for J.C. v. Brownsville Indep. Sch. Dist.*, 2023 WL 3918987, at *2 (5th Cir. June 9, 2023). Consequently, T.B. may continue to pursue compensatory damages.

### D. Exclusions

Finally, T.B. argues that she should be excused from exhaustion because it would be futile and inadequate, and because it would cause irreparable harm.[3] [Dkt. 13 at 10.] The IDEA's exhaustion provision is somewhat flexible, and the Supreme Court has held that "parents may bypass the administrative process where exhaustion would be futile or inadequate." *Honig*, 484 U.S. at 327. The burden rests on the party asserting futility. *Id.*; *Jamie S.*, 668 F.3d at 494 n.2. In this case, the Court is not persuaded that any exclusion applies.

---

[3] The complaint also alleges that T.B. seeks systemic relief, which is unavailable under the IDEA, but T.B. did not brief this argument so it is waived. [Dkt. 1, ¶¶ 103, 105.]

The IDEA sets forth an administrative process for resolving disputes about a school's provision of a FAPE. First, a parent may file a complaint with the local or state educational agency (depending on state law). *See* 20 U.S.C. § 1415(b)(6). The parties then confer in a "preliminary meeting" or, if they so choose, engage in mediation. § 1415(f)(1)(B)(i); *see* § 1415(e). If the dispute continues, it proceeds to a "due process hearing" before an impartial hearing officer ("IHO"), who hears the case and may grant relief "as the court determines is appropriate." § 1415(f)(1)(A), (i)(2)(C)(iii); *see* § 1415(f)(3)(A)(i). If the hearing is conducted at the local level, any ruling is appealable to the state agency. § 1415(g). Finally, a dissatisfied parent may seek judicial review in state or federal court. § 1415(i)(2)(A).

The IDEA says little about what substantive relief can or cannot be provided, except that an IHO's decision must be "based on a determination of whether the child received a [FAPE]." § 1415(f)(3)(E)(i). However, courts have interpreted the IDEA to mean an IHO cannot provide compensatory damages, *Luna Perez*, 598 U.S. at 143, but can order compensatory education to remedy past denial of a FAPE. *Roe v. Healey*, 78 F.4th 11, 16 (1st Cir. 2023); *Cooper v. Sch. City of Hammond*, 2023 WL 5898438, at *6 (N.D. Ind. Sept. 8, 2023) (citing *Charlie F. v. Bd. of Educ. of Skokie Sch. Dist. 68*, 98 F.3d 989, 991 (7th Cir. 1996), *abrogated in part on other grounds by Fry v. Napoleon Cmty. Sch.*, 580 U.S. 154 (2017)). The IDEA also provides for some forms of cost recovery in certain circumstances, including reimbursement for private school enrollment and attorney's fees. *Winkelman ex rel. Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516, 526 (2007) (citing §§ 1412(a)(10)(C)(ii), 1415(i)(3)(B)). Finally,

regardless of the relief ordered, an IHO has no power to enforce an order. *R.F. by & through Holderman v. Bd. of Educ. of City of Chicago*, 2022 WL 1805099, at *8 (N.D. Ill. June 2, 2022).

T.B. argues that exhaustion should be excused because an IHO cannot provide the relief she seeks and any relief an IHO could grant would be inadequate. In sum, T.B. seeks (1) a declaratory judgment; (2) injunctive relief including in-person CART services and completed notes for each class; training to all educators and staff in District 86 and the Hinsdale Board on Title II and Section 504 effective communication and equal education requirements; and policies and procedures in place at District 86 and the Hinsdale Board to provide deaf and hard of hearing individuals with their preferred mode of communication in a timely manner, including in-person CART services upon request; (3) compensatory damages; and (4) attorney's fees. [Dkt. 1 at 22.]

First, the fact that an IHO cannot make a declaratory judgment as to Defendants' liability under the ADA or Rehabilitation Act alone isn't enough to preclude exhaustion. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998) ("Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement.").

As to injunctive relief, T.B. states that an IHO can order compensatory education but that T.B. doesn't need "tutoring or other supplemental educational services," because she has good grades; she just needs equal access to instruction. [Dkt. 13 at 11.] However, compensatory education isn't limited to tutoring or remedial

education. It includes all "special education and related services," which could include the in-person CART services and class notes that T.B. seeks. *Roe*, 78 F.4th at 16. It's also not a foregone conclusion that an administrative process would result in inadequate relief. The crux of T.B.'s complaint alleges that Defendants are not providing services required by her IEP (in-person CART services) and essentially seeks a modification to her IEP (for guaranteed notes). The injuries she alleges (lost access to education and resulting feeling of frustration and distress) derive from lack of access to these services. An IHO can order Defendants to comply with the IEP and provide in-person CART services. An IHO can also determine that guaranteed notes are necessary for a FAPE.

Additionally, while the IDEA, ADA, and Rehabilitation Act set out different standards for a FAPE as opposed to effective communication, *see K.M.*, 725 F.3d (describing difference in substantive requirements), it's not necessarily true that what is required for a FAPE for T.B. would not satisfy her need for effective communication. While courts have previously described the IDEA as setting a "floor of access to education," *see, e.g., id.* at 1097, *Endrew* clarified that an education program generating only *de minimis* progress is insufficient. 580 U.S. at 402. Instead, it must be reasonably calculated to enable a student to progress in light of their circumstances, which will "differ dramatically" from child to child. *Id.* at 400. What program is appropriate for T.B. is a case-specific question best answered by her parents and IEP team through the IDEA's administrative process. Consequently, the

Court can't conclude that compensatory education such as the services T.B. requests would be inadequate.

Relatedly, T.B. argues that even if an IHO orders Defendants to comply with her IEP, the process would be futile because an IHO cannot enforce such an order. However, multiple courts have concluded that noncompliance with a final administrative decision makes the plaintiff an "aggrieved party" under the IDEA and allows them to then sue in court to enforce the IHO's order. *R.F.*, 2022 WL 1805099, at *8–9 (holding that a plaintiff may file § 1983 action to enforce hearing officer's order because the IDEA provides no enforcement mechanism) (collecting cases); *see, e.g.*, *Dominique L. v. Bd. of Educ. of the City of Chicago*, 2011 WL 760019 (N.D. Ill. Feb. 25, 2011) (enforcing final administrative order to comply with IEP in § 1983 action). The point of the IDEA's administrative process is to provide the parties an opportunity to air their views on proper design and implementation of a child's IEP. *Endrew*, 580 U.S. at 404. Requiring them to undergo this process and then enforce in court if the district fails to comply with a final order doesn't make that process futile. Finding otherwise would create an end run on the IDEA's exhaustion provision.

Next, T.B. argues that an IHO cannot order the training or policy changes she requests. Defendants dispute this, but neither party offers much by way of support for their positions. [*See* Dkt. 14 at 7.] It's plausible that an IHO may not be able to order training specific to the ADA or Rehabilitation Act because the text of the IDEA contemplates relief related to the denial of a FAPE, not violations of other statutes. *See* 20 U.S.C. § 1415(f)(3)(E)(i). The policy changes T.B. requests also mirror the

ADA's effective communication requirements.[4] Even so, this isn't sufficient to allow a complete circumvention of the IDEA's administrative process. As stated, the purpose of exhaustion is to allow a student's parents and IEP team to use their expertise and proximity to the student to craft an educational plan best suited to the student and voice their respective opinions before the issue reaches court. *Endrew*, 580 U.S. at 404; *see also Miksis v. Evanston Twp. High Sch. Dist. # 202*, 235 F. Supp. 3d 960, 1005 (N.D. Ill. 2017), *as amended* (Feb. 2, 2017) ("'[A]pplication of the exhaustion doctrine is intensely practical', and '[t]he ultimate decision of whether to waive exhaustion should not be made solely by mechanical application of the [applicable] factors, but should also be guided by the policies underlying the exhaustion requirement.'" (quoting *Bowen v. City of N.Y.,* 476 U.S. 467, 484 (1986))). The bulk of what T.B. seeks is relief for denial of a FAPE, primarily through services required by or a modification to services required by her IEP. If T.B. receives the services requested, her injuries will be largely redressed. Conversely, it would defeat the IDEA's purpose to allow a plaintiff to circumvent the process entirely by requesting relief that isn't available through the IDEA and is only loosely related to the injuries alleged. *Luna Perez* supports this conclusion in stating that a claim seeking relief the IDEA cannot provide may proceed while relief the IDEA can provide

---

[4]     The requested policy changes seem to go beyond what the ADA requires by requiring Defendants to provide deaf and hard of hearing students with their preferred mode of communication, whereas effective communication regulations only require that a student's preference be given primary consideration. *See Saldana v. Cook Cnty. Health & Hosps. Sys.*, 2024 WL 4792113, at *6 (N.D. Ill. Jan. 5, 2024) ("[A] public entity must ordinarily honor the disabled person's choice unless it can demonstrate that another equally effective means of communication is available or that the use of the means chosen would result in an undue burden.").

is deferred until the IDEA has been exhausted. 598 U.S. at 150. Consequently, T.B. must exhaust the IDEA's administrative process before seeking relief available under the IDEA, including in-person CART services and guaranteed class notes. Her Title II and Section 504 claims can proceed as to the remaining relief that the IDEA cannot provide.

Finally, T.B. argues that she will suffer irreparable harm due to lost access to education if she is forced to exhaust. She didn't expand on this point and the Court disagrees. The administrative process can potentially provide relief T.B. seeks that would redress her injuries.

### E.      CRRRA Claim (Count III)

Given the Court's holding that Counts I and II can proceed under the ADA and Rehabilitation Act to seek relief unavailable under the IDEA, T.B.'s CRRRA claim (Count III) is not premature and may also proceed. *See* 775 ILCS 60/15 (A violation of Section 504 of the Rehabilitation Act or Title II of the ADA "shall constitute a violation of this Act.").

## IV.      Conclusion

For the reasons above, Defendants' motion to dismiss [Dkt. 9] is granted in part and denied in part. T.B. must exhaust her administrative remedies as to injunctive relief that is available under the IDEA, specifically T.B.'s request for in-person CART services and guaranteed class notes. Her claims may otherwise proceed.

Enter: 24-cv-12218
Date: June 12, 2025

_____

Lindsay C. Jenkins